UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

GARY R. GAUTHIER, JR.,            )
                                 )
            Plaintiff            )
                                 )
v.                               )   Civil No. 06-194-P-S
                                 )
ANDROSCOGGIN COUNTY              )
JAIL ADMINISTRATION,             )
                                 )
            Defendant            )

### *Recommended Decision on Defendant's Motion to Dismiss or Motion for Summary Judgment*

Gary Gauthier, an inmate at the Maine State Prison, has filed a civil rights action listing many claims against a single defendant, the Androscoggin County Jail Administration. Gauthier was a pre-trial detainee at the jail in 2006, was transferred to another facility for trial, and was returned to the jail for a short period after he was convicted of murder and was awaiting sentencing. In his amended complaint Gauthier sets forth the following claims: Invasion of inmate privacy; tampering with inmate mail; placing inmates at risk; discrimination; illegal transport; unlawful contact; unsanitary conditions; and the denial of access to courts. The jail has filed a motion to dismiss and, in the alternative, a motion for summary judgment. (Dockets Nos. 41 & 45.)[1] I recommend that the Court deny the motion to dismiss and grant the motion for summary judgment.

---

[1]     Gauthier has also filed a motion for summary judgment (Docket No. 39) and a motion for oral argument (Docket No. 40) which I address in a separate opinion. Because of Gauthier's pro se status, in the following discussion I have considered Gauthier's own summary judgment argument and the attachments Gauthier has filed with his motion before making this recommendation. See Ricci v. Applebee's Northeast, Inc., 297 F.Supp.2d 311, 321 (D. Me. 2003), clarified respecting other issues, 301 F. Supp. 2d 51 (D. Me. 2004).

***Motion to Dismiss***[2]

The jail has filed a motion that seeks dismissal of Gauthier's claims for failure to state a claim and, in the alternative, summary judgment based on the material facts set forth it its statement of fact and its responses to Gauthier's additional facts.  In my view, reading Gauthier's pro se amended complaint through the pleading standard of Erickson v. Pardus, __ U.S. __, __,127 S. Ct. 2197, 2200 (2007), see also e.g., Nasious v. Two Unknown B.I.C.E. Agents __ F.3d __, __-__, 2007 WL 1895877, *1 -4 (10th Cir. July 3, 2007), Gauthier's complaint sufficiently states his claims against the jail.[3]

***Summary Judgment Standard***

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" United States v. Union Bank For Sav. & Inv. (Jordan), 487 F.3d 8, 17 (1st Cir. 2007) (quoting  Federal Rule of Civil Procedure 56(c)). I draw all reasonable inferences in favor of Gauthier, but where he bears the burden of proof, he "'must present definite, competent evidence' from which a reasonable jury could find in [his] favor." Id. (quoting United States v. One Parcel of Real Prop ., 960 F.2d 200, 204 (1st Cir. 1992)).

---

[2]     The defendant raised a 42 U.S.C. § 1997e non-exhaustion defense in its answer to the amended complaint (Answer ¶ 20) but it does not argue non-exhaustion in this motion.

[3]     Gauthier does not articulate the customs and or policy underlying the various claims in his complaint allegations, but he has named the jail as his only defendant so, as a matter of course, he can only succeed on a theory of municipal liability.  It is also evident that the jail has been able to fully comprehend his claims from the complaint allegations and Gauthier has agreed with its construction of the claims (although not the discussion) in responding to the defendant's motion.

***Standard for Determining Androscoggin County Jail's Liability***

There is no question that liability can adhere to the sole defendant in this action, the Androscoggin County Jail, only to the extent that Gauthier can meet the municipal liability standard. See Bd. of County Comm'rs. v. Brown, 520 U.S. 397, 402-04 (1997). "In an action pursuant to 42 U.S.C. § 1983, there can be no municipal liability under a respondeat superior theory." Fabiano v. Hopkins, 352 F.3d 447, 452 (1st Cir. 2003) (citing Monell v. Dept. of Soc. Servs., 436 U.S. 658, 690-95 (1978)). Instead, to establish liability against the jail, Gauthier "must prove deprivation of a constitutional right by means of 'the execution of the government's policy or custom.'" Id. (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989) and citing Monell, 436 U.S. at 690-94). There must be a "direct casual link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton v. Harris, 489 U.S. 378, 385 (1989).

"Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." Brown, 520 U.S. at 403-04 (citing Monell, 436 U.S. at 694). "Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Id. at 404 (citing Monell, 436 U.S. at 690-91, in turn citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970)).

### *Gauthier's Claims*

There is no dispute as to the following.  Gary Gauthier was detained at the Androscoggin County Jail from January 11, 2006, to May 20, 2006, when he was transferred to a different facility.  Gauthier was convicted of two murders in Androscoggin County Superior Court on October 30, 2006. He was again held at the jail from October 20, 2006, to January 11, 2007, before being transferred for sentencing and sent to the Maine State Prison.  (Def.'s SMF ¶¶ 1, 2; Pl.'s Resp. SMF ¶¶ 1,2.)

#### A.    *Invasion of Privacy*

#### 1.    **Shower**

With respect to the invasion of privacy claim, Gauthier alleges "that female officers were capable of viewing male inmates while taking a shower." (Def.'s SMF ¶ 3; Pl.'s Resp. SMF ¶ 3.)   The "shower viewing" issue pertains only to the period from January 11, 2006, to May 20, 2006. (Def.'s SMF ¶ 4; Pl.'s Resp. SMF ¶ 4.)[4]  Gauthier describes the shower areas in the medium security blocks as "a box with a clear curtain." (Def.'s SMF ¶ 5; Pl.'s Resp. SMF ¶ 5.)  During his deposition, he testified to only two specific instances in which he believes he saw a female jail guard looking at him in the shower area, and in one of those alleged instances it was as he stepped out of the shower. (Def.'s SMF ¶ 6; Pl.'s Resp. SMF ¶ 6.) Gauthier describes the alleged shower viewing as "glances." (Def.'s SMF ¶ 7; Pl.'s Resp. SMF ¶ 7.)   The defendants deny that Officer Westleigh, one of the correctional officers who circulated in this area, ever observed Gauthier showering or coming out of the shower.  (Def.'s Resp. SAMF ¶ 6; Westleigh Aff. ¶ 5.)

---

[4]    Gauthier explains that the claim only pertains to this period because when he was transferred back to the jail in October 2006, he was placed in maximum security where the shower set-up was different. (Pl.'s SAMF ¶ 4; Def.'s Resp. SAMF ¶ 4.)

Gauthier explains that he did not always pay attention to when a female guard was in the room and, therefore, he speculates, many instances most likely went unnoticed; guards did their rounds approximately every 15-30 minutes.  (Pl.'s SAMF ¶ 6; Gauthier Dep. at 13-14, 16-17.)[5]

Gauthier did not make any written complaints about the shower configuration and the only verbal "complaint" he claims he made was a statement to one of the female jail officers that "it's ridiculous having clear showers – shower curtains and having females working there." (Def.'s SMF ¶ 8; Pl.'s Resp. SMF ¶ 8; Pl's SAMF ¶ 8.)   The defendant denies that Gauthier made the alleged comment about clear shower curtains to Officer Westleigh.  (Def.'s Resp. SAMF ¶ 8; Westleigh Aff. ¶ 6.)   Gauthier admits that he never asked a jail officer to take the shower issue to the jail administration. (Def.'s SMF ¶ 9; Pl.'s Resp. SMF ¶ 9; Pl.'s SAMF ¶ 9; Def.'s Resp. SAMF ¶ 9.)

With respect to his invasion of privacy claim, Gauthier maintains that the number of instances that he might have been observed is irrelevant.  However, it is doubtful that the summary judgment record supports the conclusion that there was a constitutional violation at all in the two glances by a female officer that Gauthier can attest to.  See Canedy v. Boardman, 16 F.3d 183, 187 (7th Cir. 1994) ("[P]at-down searches and occasional or inadvertent sighting by female prison employees of inmates in their cells or open showers do not violate the inmates' right to privacy.  But that right is violated where this observation is more intrusive (like a strip search, in the absence of an emergency) or a regular occurrence.");  Cookish v. Powell, 945 F.2d 441, 447 (1st Cir. 1991) ("[I]nadvertent and occasional observations, or casual observations restricted by distance,

---

[5]      Gauthier also expounds that the number of instances is irrelevant as he was embarrassed by the times he was aware of the invasion of his privacy. As the defendant notes, this is argument not properly included in a statement of fact.

of inmates dressing, showering, being strip searched or using toilet facilities do not rise to the level of constitutional infringement."); see also  Borlawsky v. Town of Windham, 115 F.Supp.2d 27, 30 (D. Me. 2000);  Ellis v. Meade, 887 F. Supp. 324, 331 -32 (D. Me. 1995).    In addition, the number of times Gauthier and other inmates were observed in this fashion (and whether or not there were complaints) is relevant to whether or not the jail administrator responsible for the shower arrangement was responsible for an impermissible custom of allowing an invasion of privacy.  Gauthier has not generated a dispute of fact sufficient to hold the defendant responsible for any violation of his privacy stemming from the clear shower curtain.

**2.    Interaction between Male and Female Inmates**

With regards to his invasion of privacy claim, Gauthier further alleges that "[f]emale inmates in medium and maximum security were in plain sight of male inmates" such that they could see and hear each other. (Def.'s SMF ¶ 10; Pl.'s Resp. SMF ¶ 10.) Gauthier admits that male inmates and female inmates are housed in separate maximum security blocks. (Def.'s SMF ¶ 11; Pl.'s Resp. SMF ¶ 11.)    He alleges that the inmates can see and hear each other between blocks because the blocks are close enough to each other that the inmates can be seen through the windows in the cell block doors and they can talk through the doors. (Def.'s SMF ¶ 12; Pl.'s Resp. SMF ¶ 12.)

Gauthier further asserts that female inmates were flashing the males and male and female inmates were able to speak to each other through the sink or the vent in the maximum security area where he was housed during his first twenty-one days at the jail and when he was transferred back to the jail in October 2006.  (Pl.'s SAMF ¶ 12; Gauthier Dep. at 18-19.)  In articulating his objection to the alleged situation, Gauthier

6

indicates only that "it's not right" and that otherwise "I'm not sure exactly how to explain it." (Def.'s SMF ¶ 14; Pl.'s Resp. SMF ¶ 14.)[6]  Gauthier further concedes that the jail did not force him to look at the female inmates or to speak with them. (Def.'s SMF ¶ 15; Pl.'s Resp. SMF ¶ 15.)[7]

Gauthier did not report this issue to the jail as a problem. (Def.'s SMF ¶ 13; Pl.'s Resp. SMF ¶ 13.)  Gauthier explains that he did not report this issue to the jail as a problem because the "jail was making things hard on him at the time and he was not going to report something else to make it even harder on him."  (Gauthier Dep. at 19; Pl.'s SAMF ¶ 13.)[8]  The defendant points out that Gauthier does not allege that the jail was ever aware that these alleged interactions took place.  (Def.'s Resp. SAMF ¶ 12.)

Vis-à-vis the interaction between male and female inmates at the jail, Gauthier never reported the alleged communication to the jail because he did not want things to get tougher for him.  I am highly skeptical that this states any kind of invasion of privacy claim that Gauthier would have standing to pursue, but even if it did there is no evidence that a policy maker responsible for controlling the possibility for interplay between female and male inmates could have or should have known about, much less have condoned, the situation.

---

[6]     Gauthier explains that he is not an attorney and did not know how to explain the situation during his deposition.  (Pl.'s SAMF ¶ 14.)  As the defendant points out this is not a statement of fact material to the issues at hand.  (Def.'s Resp. SAMF ¶ 14.)

[7]     Gauthier complains that he may not have been forced to look at the female inmates or speak to them, but he should not have been put in such an awkward position.  (Pl.'s SAMF ¶ 15.)  As the defendant points out, this is not a proper statement of fact.  (Def.'s Resp. SAMF ¶ 15.)

[8]     The defendant responds that what is going on inside Gauthier's head is nothing that it can respond to and these private thoughts reflect nothing more than conclusions.  (Def.'s Resp. SAMF ¶ 13.)

**B.     Conditions of Confinement Claims**

Four of Gauthier's claims are complaints about the conditions of confinement at the jail.[9] As Gauthier was a pre-trial detainee at the jail, these claims are analyzed utilizing Eighth Amendment precedents: "Pretrial detainees are protected under the Fourteenth Amendment Due Process Clause rather than the Eighth Amendment; however, the standard to be applied is the same as that used in Eighth Amendment cases." Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002) (citing Bell v. Wolfish, 441 U.S. 520, 545 (1979) and 1 M.B. Mushlin, Rights of Prisoners § 2.02 (2d ed. Supp.2001)); see also See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983); Henderson v. Sheahan, 196 F.3d 839, 844 n.2 (7th Cir. 1999); Hare v. City of Corinth, 74 F.3d 633, 647-50 (5th Cir. 1996); Upham v. Gallant, No. 99-2224, 230 F.3d 1347, 2000 WL 1425759, *1 (1st Cir. Sept. 15, 2000)(unpublished); Elliott v. Cheshire County, 940 F.2d 7, 10 (1st Cir. 1991).

The Eighth Amendment imposes duties on correctional officials, "who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832-33 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). Farmer set forth a two-part test. "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). Second, "a prison official must have a 'sufficiently culpable state of mind," id. at 834 (quoting Wilson, 501 U.S. at 297), and "[i]n prison-conditions cases that state of mind is one of 'deliberate

---

[9]     I include the "illegal transport" claim as a condition of confinement claim even though it involved his transfer to another facility.  In the discussion below I combined the inmate risk and unlawful contact claims.

indifference' to inmate health or safety," id. (citing Wilson, 501 U.S. at 302-03).   Under

this second Farmer prong "a prison official may be held liable under the Eighth

Amendment for denying humane conditions of confinement only if he knows that

inmates face a substantial risk of serious harm and disregards that risk by failing to take

reasonable measures to abate it."  Id. at 847.

### 1.        Inmate Risk and Unlawful Contact

Apropos his "inmate risk" claim, there is no dispute that Gauthier testified during

his deposition that he felt at risk at certain times when he was identified as a "protective

custody" inmate but that he admits it was simply a generalized feeling of risk. (Def.'s

SMF ¶ 28; Pl.'s Resp. SMF ¶ 28.)  Gauthier was not involved in any physical altercations.

(Def.'s SMF ¶ 29; Pl.'s Resp. SMF ¶ 29.)  Gauthier could not identify any particular

inmates who made verbal threats to him (Def.'s SMF ¶ 30; Pl.'s Resp. SMF ¶ 30) because,

Gauthier asserts, he did not know their names (Pl.'s SAMF ¶ 30; Gauthier Dep. at 32).[10]

The defendant underscores that Gauthier acknowledges he never indicated to the jail

employees that he had a problem with any particular inmates or that he was in fear of

being assaulted. (Def.'s Smf ¶ 31; Gauthier Dep. at 32.)   Gauthier responds that he never

specified particular inmates he had problems with but that he did make several verbal

complaints to correction officers, although he refrained from submitting written

complaints because that would have made his life harder.  (Pl.'s Resp. SMF ¶ 31.)

With respect to his "unlawful contact" claim, Gauthier does not allege he was

attacked by other inmates. (Def.'s SMF ¶ 55; Pl.'s Resp. SMF ¶ 55.)  He admits he was

not attacked by anyone while housed at the jail.  (Def.'s SMF ¶ 56; Pl.'s Resp. SMF ¶ 56.)

---

[10]        The defendant attempts to qualify this statement of additional fact by asserting that it is argument;
however, the deposition testimony cited by Gauthier places this in the category of fact and it is a fact that
does have material relevance to this  claim given the defendant's argument that the threat was theoretical.

Gauthier conceded at his deposition that his "unlawful contact" claim was based upon an apprehension that he might be assaulted.  (Def.'s SMF ¶ 57; Pl.'s Resp. SMF ¶ 57.) According to the defendant Gauthier was not concerned about any particular inmates attacking him and did not report to the jail any concerns about being attacked by any particular inmates. (Def.'s SMF ¶¶ 58,59; Gauthier Dep. at 59.)   Gauthier responds by indicating that he did not report concerns about inmates because he was referring to correction officers attacking him and he was not about to make a complaint to people that he was in fear of being attacked by.  (Pl.'s Resp. SMF ¶¶ 58,59; Gauthier Dep. at 59-60.)

With respect to the question of whether or not there is an underlying Eighth Amendment violation, there is no evidence that Gauthier faced a substantial risk of serious harm.  More important for purposes of the single defendant here, Gauthier has no basis for holding the defendant liable on a policy or custom theory for his claim of inmate risk or unlawful contact.  There is no dispute that he only verbally told unspecified officers that he felt at risk and did not indicate to a single jail employee that he was in fear of correction officers.  The fact that the jail houses people charged with criminal offenses is surely not sufficient to hold it liable for having a policy of placing inmates in a situation in which they experience a generalized feeling of risk.

### 2.    Illegal Transport

There is no dispute that Gauthier was housed at the jail from January 11, 2006, to May 20, 2006. (Def.'s SMF ¶ 45; Pl.'s Resp. SMF ¶ 45.)  On or about May 20, 2006, Gauthier was moved to the York County Jail. (Def.'s SMF ¶ 46; Pl.'s Resp. SMF ¶ 46.)  It is the move from the jail to the York County Jail on May 20, 2006, that Gauthier alleges was "illegal." (Def.'s SMF ¶ 47; Pl.'s Resp. SMF ¶ 47.)  At his deposition, Gauthier

conceded that his objection to the move from the jail to the York County Jail is that the move was "unjust."(Def.'s SMF ¶ 48; Pl.'s Resp. SMF ¶ 48.)  Gauthier acknowledges that it is reasonable for jails to withhold the fact that a move is going to occur from the inmate because the jails "don't want any problems."(Def.'s SMF ¶ 49; Pl.'s Resp. SMF ¶ 49.)  Gauthier does not object to the fact that he was not told in advance about the move from the jail to the York County Jail. (Def.'s SMF ¶ 50; Pl.'s Resp. SMF ¶ 50.)  The jail moved Gauthier to the York County Jail at 10:00 p.m. purely for practical and safety reasons. (Def.'s SMF ¶ 52; Pl.'s Resp. SMF ¶ 52.)   The vehicle for the move was available and the time of day would ensure minimal disruption for the jail. (Def.'s SMF ¶ 53; Pl.'s Resp. SMF ¶ 53.) Gauthier admits the officers who moved him did not hurt him in any way. (Def.'s SMF ¶ 54; Pl.'s Resp. SMF ¶ 54.)

The defendant asserts that Gauthier's sole objection is that the move occurred at 10:00 p.m. at night. (Def.'s SMF ¶ 51; Gauthier Dep. at 54- 55.)  Gauthier responds that he did not have an opportunity at his deposition to answer this broad question.  He states that he feels his rights were violated because he was moved to the York County Jail without a thorough investigation with fact-finding proof of his co-defendant's and other inmates' allegations.  He believes that had the jail investigated he would never have been moved.  (Pl.'s Resp. SMF ¶ 51.)

Gauthier's protest over his transfer to the York County Jail does not survive on this summary judgment record.  Gauthier has not produced sufficient evidence that the jail customarily transfers inmates later in the evening or that it transfers inmates without a sufficient basis for doing so.  He now seems to claim that, as to him, there was an inadequate investigation into the reasons he was selected for transfer.  He has no

evidence that there was a causal link between a person responsible for setting the policy for transfers and his transfer. It also must be noted that it is hard to make out a violation of Gauthier's constitutional rights as a condition of confinement claim once the summary judgment facts are set forth.[11]

### 3. Unsanitary conditions

Gauthier objects to the fact that at the time he was incarcerated at the jail, the officers who passed out the food trays did not wear hair nets or gloves. (Def.'s SMF ¶ 60; Pl.'s Resp. SMF ¶ 60.) The corrections officers who distribute food trays do not prepare the food and do not handle the food itself. (Def.'s SMF ¶ 61; Pl.'s Resp. SMF ¶ 61.) Gauthier has no facts to establish that he was ever ill as a result of the lack of hair nets or gloves. (Def.'s SMF ¶ 62; Pl.'s Resp. SMF ¶ 62.)

The dinner meal at the jail is served from 4:30 to 5:30 in the evening and the breakfast meal is served from 6:30 to 7:30 in the morning. (Def.'s SMF ¶ 63; Pl.'s Resp. SMF ¶ 63.) The meals are reviewed and approved by a licensed nutritionist. (Def.'s SMF ¶ 64.) All jail meals provide approximately 2,500 calories. (Def.'s SMF ¶ 65.)[12] This caloric intake is consistent with recommended levels endorsed by the United States Department of Agriculture. (Def.'s SMF ¶ 66; Pl.'s Resp. SMF ¶ 66.)

Gauthier acknowledges the jail assigns a safety razor to each inmate. (Def.'s SMF ¶ 67; Pl.'s Resp. SMF ¶ 67.) No two inmates share the same razor. (Def.'s SMF ¶ 68; Pl.'s Resp. SMF ¶ 68.) The jail has a system for keeping razors separate and identified by

---

[11]    The parties have not suggested that Gauthier had some sort of due process right attendant to the transfer.

[12]    Gauthier claims that there is no possible way that the meals served were reviewed and approved by a licensed nutritionist and provided 2500 calories, but he relies only on the testimony of unspecified potential witnesses that he has no access to for purposes of obtaining affidavits. (Pl.'s Resp. SMF ¶¶ 64, 65; see also Pl.'s SAMF ¶ 66.)

inmate. (Def.'s SMF ¶ 69; Pl.'s Resp. SMF ¶ 69.) Gauthier concedes he is not aware of anyone "messing with" his razor while at the jail. (Def.'s SMF ¶ 70; Pl.'s Resp. SMF ¶ 70.) However, he maintains that the jail's system is not foolproof because both inmates and corrections officers have complete access to the razors. (Pl.'s SAMF ¶ 69; Gauthier Dep. at 63-64.)[13]

Once seen through the summary judgment record lens, it is evident that Gauthier's unsanitary conditions claims are about entirely speculative risk. To succeed on a deliberate indifference/conditions of confinement claim Gauthier must do more than articulate a speculative risk. In Overton v. Bazzetta, addressing the Eighth Amendment standard, the Supreme Court inquired whether the condition was "a dramatic departure from accepted standards for conditions of confinement." 539 U.S. 126, 137 (2003) (citing Sandin v. Conner, 515 U.S. 472, 485 (1995)). Additionally a court must ask, whether the regulations "create inhumane prison conditions, deprive inmates of basic necessities or fail to protect their health or safety" or "involve the infliction of pain or injury, or deliberate indifference to the risk that it might occur." Id. (citing Estelle v. Gamble, 429 U.S. 97 (1976) and Rhodes v. Chapman, 452 U.S. 337 (1981)). All three of Gauthier's unsanitary conditions complaints fall far short of this standard.

### C.     Discrimination of an Inmate

There is no dispute that Gauthier feels he should not have been assigned to a maximum security unit if another inmate who was being held on the same charges -- a Thomas Dyer was being held on murder charges arising out of the same incident that

---

[13]       As the defendant points out (Def.'s Resp. SAMF ¶ 69.), the deposition testimony cited by Gauthier is entirely conjecture.

resulted in Gauthier's incarceration -- was assigned to a medium security unit.   (Def.'s SMF ¶ 33; Pl.'s Resp. SMF ¶ 33.)

According to the defendant, Gauthier admitted at his deposition that his discrimination claim is based upon the fact that he was assigned to a maximum security unit for the first twenty-one days of his incarceration. (Def.'s SMF ¶ 32; Gauthier Dep. at 44 -45.)   Gauthier responds that at the time of his deposition he could not recall any other discriminatory things that had occurred but that he was discriminated against by the jail in many other ways.   (Pl.'s Resp. SMF ¶ 32.)   He cites to his amended complaint allegations which do include an allegation that he received no contact visits while his co-defendant (who was charged with the same crime) was allowed contact visits, he was placed on suicide watch for a number of days and not allowed writing materials and other such items, he was allowed two hours outside of his cell per day while his co-defendant was allowed out for longer periods, and his co-defendant was in medium security for twenty-one days while Gauthier was in maximum security.   (Am. Compl. ¶ 4.)   He also alleges that when he was transported to Cumberland County Jail for trial he was classified as medium security but when he was transported back to Androscoggin County Jail he was placed in administrative segregation/maximum security without a reason being given.   (Id. ¶ 5.)   And, then, on November 25, 2006, Gauthier was placed in high maximum security for a comment he made to another inmate.   This status allowed him out of his cell for only one hour a day – the only time he had to write, phone, or shower -- and he could have nothing in his cell but a book.   During this time other inmates arrived in high max for physically assaulting an officer and were transferred back to lower

security within one week while Gauthier, who believed he would be reclassified for good behavior, remained in high max through his sentencing.  (Id. ¶ 6.)

There is no genuine dispute[14] that Gauthier was originally assigned to maximum security based upon the completion of a form used by the jail to determine the appropriate assignment.  (Def.'s SMF ¶ 34; Pl's Resp. SMF ¶ 34.)  In Gauthier's case, his profile, which is translated into a numerical value based upon responses to a series of questions, indicated that he should be held in a maximum security unit. (Def.'s SMF ¶ 35; Pl.'s Resp. SMF ¶ 35.) The fact that Gauthier was being held on a murder charge, pending trial, was one of several factors that generated Gauthier's numerical profile because the class of the charges is a relevant factor. (Def.'s SMF ¶ 36; Pl.'s Resp. SMF ¶ 36.) Other factors – such as Gauthier's criminal history – also affected his numerical profile. (Def.'s SMF ¶ 37; Pl.'s Resp. SMF ¶ 37.)  Due to good behavior and the lack of any disciplinary issues, Gauthier's assignment was reclassified to medium security effective January 31, 2006. (Def.'s SMF ¶ 38; Pl.'s Resp. SMF ¶ 38.) There is no dispute that, after he returned to the jail in October of 2006, he was assigned to high maximum security in November of 2006 because he was found with contraband and because he threatened a jail officer. (Def.'s SMF ¶ 40; Pl.'s Resp. SMF ¶ 40; Def.'s Resp. SAMF ¶ 40; Feldman Aff. ¶ 9.) Gauthier adds that he was never given an explanation for his placement in maximum security and he was held there for substantial periods of time when compared to other inmates who were being held in high maximum security for physical altercations.  (Pl.'s SAMF ¶ 40; Gauthier Dep. at 47-49, 51; K. Gauthier Aff. ¶¶ 21, 25-28.)

---

[14]    Gauthier qualifies several of the following paragraphs by basically parroting the defendant's statement and citing the same exhibits.

According to the defendant, subsequent housing assignments for Gauthier were dictated by his conduct in the facility and the needs of jail security: reclassification to higher security was effected when Gauthier was involved in disciplinary issues or when there were safety concerns; reclassification to lower security was effected when Gauthier complied with jail regulations and exhibited good behavior. (Def.'s SMF ¶ 39;  Feldman Aff. ¶ 8.)  Gauthier was retained in high maximum security until he was transferred to the Maine State Prison because of ongoing concerns about the safety risk that he posed. (Def.'s SMF ¶ 41; Def.'s Resp. SAMF ¶ 40; Feldman Aff. ¶ 10.)  Gauthier counters that he was not reclassified to lower security when he exhibited good behavior and complied with jail regulations.  He was held in high maximum security from November 25, 2006, until his departure for the Maine State Prison on January 11, 2007, although he followed all the rules.  (Pl.'s Resp. SMF ¶¶ 39, 41; Gauthier Dep. at 49-52; K. Gauthier Aff. ¶¶ 25 - 28.)

The defendant states that Thomas Dyer's initial housing assignment was determined based upon the completion of a form similar to that completed for Gauthier. (Def.'s SMF ¶ 42  Feldman Aff. ¶ 11).  Subsequent housing assignments for Dyer were dictated by his conduct in the facility and the needs of jail security: reclassification to higher security was effected when Dyer was involved in disciplinary issues or when there were safety concerns and reclassification to lower security was effected when Dyer complied with Jail regulations and exhibited good behavior. (Def.'s SMF ¶ 43; Feldman Aff. ¶ 12).  Other than specific incidents (such as threats of violence involving Gauthier and Dyer) that necessitated heightened security at certain times, the only overriding relationship between housing assignments of Gauthier and Dyer was the fact that the two

men were not allowed to have contact with each other by reason of their involvement in the same alleged criminal acts. (Def.'s SMF ¶ 44; Lebel Aff. ¶ 8.)

In response to these Dyer-related statements, Gauthier counters that there is "no possible way" Dyer's initial housing assignment was determined based upon the completion of a form similar to the form completed on Gauthier.  He points out that Sergeant Feldman states in his affidavit that the numerical profile includes a figuring of the class of charge and Gauthier points out that Dyer was charged with the same crime as Gauthier.  (Pl.'s Resp. SMF ¶ 42; Feldman Aff. ¶ 5; K. Gauthier Aff. ¶¶ 3-6.)  Dyer, Gauthier maintains, was never reclassified to a lower security as he started out in medium security and was classified to a higher security when he got into an altercation with other inmates.  (Pl.'s Resp. SMF ¶ 43; Gauthier Dep. at 48; K. Gauthier Aff. ¶¶ 3-6.)  Gauthier states:

> There are many overriding relationships between housing assignments as follows:
>          Plaintiff was initially classified as maximum security while Thomas Dyer was placed in medium security.  When Plaintiff returned to the Jail on October 20, 2006 he was placed in maximum security administrative segregation while his co-defendant was still in medium security.  Minimum security and maximum security have different rules, giving Mr. Dyer more privileges.  Mr. Dyer was reclassified to maximum security for a physical assault.  Plaintiff was reclassified to high maximum security for a verbal altercation and finding of contraband.  Plaintiff was never released because of 'ongoing concerns about the safety risk he posed."  Mr. Dyer should have been put in high maximum security as well for the physical altercation which poses a higher safety risk.

(Pl.'s Resp. SMF ¶ 44)(record citations omitted).

Even assuming that Gauthier could demonstrate that a final policy maker for the jail was responsible for the individualized decisions to transfer Gauthier and Dyer from one status to another – as opposed to there being a final policy maker for the jail who

established the process for making those determinations -- Gauthier cannot demonstrate that there is underlying, constitutionally significant discrimination.  Quite simply, Gauthier does not even allege that he is a member of a protected class whereas Dyer was not, see cf. Oyler v. Boles, 368 U.S. 448, 456 (1962) ("Moreover, the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore grounds supporting a finding of a denial of equal protection were not alleged."); his claim is only that he was treated different than a fellow murder suspect.

### D.      Tampering with Inmate Mail

Gauthier does not dispute that the jail reserves the right to limit the amount of mail that inmates are permitted to have in their cells (Def.'s SMF ¶ 16; Pl.'s Resp. SMF ¶ 16) and that this policy is based upon a safety concern about inmates having too much paper at one time (Def.'s SMF ¶ 17; Pl.'s Resp. SMF ¶ 17).  While the defendant claims that Gauthier was aware of the jail's mail policy (Def.'s SMF ¶ 18;Gauthier Dep. at 25), Gauthier indicates that he was not aware of the jail's policy vis-à-vis "too much mail" until about three months into his incarceration (Pl.'s Resp SMF ¶ 18; Gauthier Dep. At 24-25.)  Gauthier asserts, argumentatively,[15]  that while the jail has a right to limit the amount of mail each inmate has in his or her cell, he had a right to be notified each time a piece of mail was rejected so he could appeal that determination.  (Pl.'s SAMF ¶ 16.)

The defendant maintains that Gauthier acknowledges that during the time he alleges his mail was withheld, he was receiving two to three pieces of personal

---

[15]      (See Def.'s Resp. SAMF ¶ 16.)

correspondence each day. (Def.'s SMF ¶ 19; Gauthier Dep. at 23.)  Gauthier responds that

this was an acknowledgment of "getting" mail as opposed to actually "receiving" the

mail.  (Pl.'s Resp. SMF ¶ 19; Gauthier Dep. at 23, 25-27; K. Gauthier Aff. ¶¶ 8-15.)

There is no dispute that, with regard to withheld personal correspondence, Gauthier

alleges that the longest a letter was delayed in getting to him was two weeks and that the

average delay was about a week. (Def.'s SMF ¶ 20; Pl.'s Resp. SMF ¶ 20.)

      The defendant asserts that if any of Gauthier's mail (that was otherwise compliant

with jail regulations) was withheld, this withholding was done under the jail's mail

policy. (Def.'s SMF ¶ 21; Lebel Aff. ¶ 6.) The defendant represents that Gauthier

acknowledges he has no direct knowledge that the jail destroyed any of his personal

letters (Def.'s SMF ¶ 22; Gauthier Dep. at 29) and that his belief that letters might have

been destroyed is based upon hearsay statements his wife received from the post office

(Def.'s SMF ¶ 23; Gauthier Dep. at 29). The defendant maintains that Gauthier has no

basis to think that any letters were lost or destroyed intentionally, as opposed to

accidentally. (Def.'s SMF ¶ 25; Gauthier Dep. at 29.)  The defendant represents that, to

the knowledge of the jail administrator, no personal mail of Gauthier's, that was

otherwise compliant with jail regulations, was destroyed. (Def.'s SMF ¶ 26; Lebel Aff. ¶

7.)

      Gauthier retorts that the mail policy does not state that his mail can be withheld

without his knowledge, sent to his property repository without being opened, at times

never given to him, or thrown away.  (Pl.'s Resp. SMF ¶ 21; Gauthier Dep. at 21-27; K.

Gauthier Aff. ¶¶ 8-15.)  He contends that he was verbally told by a correctional officer

that his mail had been thrown away and that he has only acknowledged that he had not

seen, nor was aware that someone else had seen, the destruction of mail.  (Pl.'s Resp. SMF ¶ 22; Gauthier Dep. at 24-25, 29; K. Gauthier Aff. ¶ 15.)  He indicates that he misspoke during his deposition when he attributed his knowledge about the mail being thrown away or destroyed to statements made by a third party to his wife, opining that he has bad short-term memory.  (Pl.'s Resp. SMF ¶ 23; Gauthier Dep. at 4, 24-25; K. Gauthier Aff. ¶ 16.)  Gauthier admits it is possible that letters he never received were simply misplaced. (Def.'s SMF ¶ 24; Pl.'s Resp. SMF ¶ 24.)[16]  He indicates that he questioned Officer Neilson about his mail and was told that he was getting too much mail which was intentionally withheld or disposed of.  (Pl.'s Resp. SMF ¶ 25; Gauthier Dep. at 21, 21-25; K. Gauthier Aff. ¶¶ 8-15.)  Gauthier observes that he has no way of truly knowing whether or not the administrator knew that it was Gauthier's mail that was being held or destroyed.  (Pl.'s Resp. SMF ¶ 26.)

With regard to both issues – the withholding of mail and the alleged destruction of mail – Gauthier did not file any complaints with the jail. (See Gauthier Dep. at 27, 29.) Gauthier adds that he did complain to correctional officers and was told that some of his mail was thrown away or put into his property box.  (Pl.'s Resp. SMF ¶ 27; Gauthier Dep. at 19, 24-22; K. Gauthier Aff. ¶¶ 8-15.)

At most Gauthier's claim demonstrates that his mail was negligently disposed of or unnecessarily delayed by an unspecified member of the jail staff.  Even if this could arise to the level of a constitutional violation, which is highly questionable, see Daniels v. Williams, 474 U.S. 327, 330-32 (1981); Felton v. Lincoln, 429 F. Supp. 2d 226, 243 (D. Mass. 2006), there is no dispute that the jail's written mail policy (see Docket No. 39-4)

---

[16]   Gauthier cites to his deposition testimony in which he indicates that this in one of several excuses given him for not receiving his mail.  (Pl.'s SAMF ¶ 24; Gauthier Dep. at 29.)  He nowhere sets forth what other excuses were proffered.

which limits the amount of mail in an inmate's cell is permissible even if there is an impingement on the inmate's constitutional rights, <u>see</u> <u>Lewis v. Casey</u>, 518 U.S. 343, 361 (1996) ("We held in <u>Turner v. Safley</u>, 482 U.S. 78 (1987), that a prison regulation impinging on inmates' constitutional rights "is valid if it is reasonably related to legitimate penological interests." <u>Id.</u>, at 89.").  Gauthier has not created a genuine dispute that there is an unwritten custom at the jail that in practice trumps the written policy and is condoned by a final decision maker that could somehow trigger the defendant's liability on a municipal liability theory.

### F.      Access to the Courts

According to the defendant, Gauthier admits that during his first stint at the jail in 2006 – from January 11 to May 20 (when he was transported to the York County Jail) – he did not make any requests for, nor was he denied access to, any law library materials. (Def.'s SMF ¶ 71; Gauthier Dep. at 65.)  Gauthier responds that he was never asked at his deposition whether or not he made verbal  -- as opposed to written  -- requests for law library materials.  (Pl.'s Resp. SMF ¶ 71.)  He claims that he made several verbal requests to correctional officers and that these requests were ignored.  (<u>Id.</u>; Gauthier Dep. at 65; K. Gauthier Aff. ¶ 17.)

There is no dispute that Gauthier claims he made two requests for law library materials from October of 2006 to January of 2007. (Def.'s SMF ¶ 72; Pl.'s Resp. SMF ¶ 72.)  However, according to the defendant, the jail records do not reflect that Gauthier made any requests for legal materials while at the jail from January 2006 to May 2006 or October 2006 to January 2007. (Def.'s DMF ¶ 73; Def.'s Resp. SAMF ¶ 69; Lebel Aff. ¶ 14.)  Gauthier maintains that he had copies of his two written requests but they got lost

when he moved to the Maine State Prison.  (Pl.'s Resp. SMF ¶ 73.)  He asserts that both requests were denied.  (Pls SAMF ¶ 72; Gauthier Dep. at 72.)

There is no dispute that the materials Gauthier claims he was seeking pertained to this pending lawsuit against the Androscoggin County Jail. (Def.'s SMF ¶ 74; Pl.'s Resp. SMF ¶ 74.)  And, that, at the time he made the requests, Gauthier was represented by an attorney in his criminal matter. (Def.'s SMF ¶ 75; Pl.'s Resp. SMF ¶ 75.)   The defendant points out that Gauthier never asked his attorney for the legal materials he was seeking. (Def.'s SMF ¶ 76; Gauthier Dep. at 67.)  Gauthier explains that he did not ask his attorney for the materials because his attorney had indicated that he could not help him with the suit because he did not deal with civil cases.  (Pl.'s Resp. SMF ¶ 76.)

According to the defendant, Gauthier received access to the materials he needed from the York County Jail or the Cumberland County Jail before he ever requested them from the jail.  It cites the following deposition exchange:

> Q. So I just want to make sure I understand the time line then. During your first stay at the Androscoggin County Jail from January of 2006 to May of 2006, you didn't request any legal materials?
> A. Correct.
> Q. Then you were at York for a period of time and you had access to the law library?
> A. Correct.
> Q. You obtained the materials you needed to file your lawsuit in this case?
> A. Correct.
> Q. When you went back to the Androscoggin County Jail, you indicated you made some additional requests for materials related to this lawsuit?
> A. Correct, and it was denied.
> Q. Okay. And I guess what I'm trying to figure out is obviously the fact that you were denied that didn't prevent you from filing your lawsuit in this case?
> A. That's correct.
> Q. And the materials –
> A. It was more of an inconvenience not being able to have the materials when I needed them and whatnot.

> Q. The information that you needed to file this lawsuit you had gotten at
> the York County Jail?
> A. Correct, and Cumberland when I went to Cumberland, but it started at
> York.

(Gauthier Dep. at 68 -69; Def.'s SMF ¶ 77.)   Gauthier responds that he received access to

the materials he needed from the York or Cumberland County Jails but that he was

moved back to the Androscoggin County Jail on October 20, 2006, ten days after filing

this law suit and he needed, but was denied, ongoing access to materials for different

stages of the lawsuit.  (Pl.'s SMF ¶ 77; Gauthier Dep. at 68-69; K. Gauthier Aff. ¶ 17.)

In my view, Gauthier has not created a triable issue on his claim that he was

denied access to court by the jail.   Gauthier believes that he was denied access to a law

library – counter to the jail's policy and procedure manual – and that this denial is an

actionable custom, policy, or practice.  (Pl.'s Resp. SMF ¶ 79.)  He has submitted a copy

of the jail's policy as an attachment to his motion for summary judgment (see Docket No.

39-7) and he at no time claims that there is a constitutional infirmity in the written policy.

Gauthier may have had a tenable claim if he had identified and sued the jail

employee/employees who countermanded the jail policy, but he cannot hold the jail liable

on a municipal liability theory unless he can demonstrate that there is an unwritten

custom at the jail that countermands the written policy and that this custom was behind

the decision of the individual jail employee's decision to deny his request for access to the

library.   He has fallen far short on meeting such a burden.

And, on a final note, even if Gauthier had generated a genuine dispute that a

custom at the jail over-road the written policy, there seems to be an insurmountable flaw

with his access to courts claim in that to succeed with such a claim he would have had to

demonstrate "actual injury" within the meaning of <u>Lewis v. Casey</u>, 518 U.S. 343 (1996) and <u>Christopher v. Harbury</u>, 536 U.S. 403 (2002) apropos the other claims in this litigation.   Gauthier has not indicated what key materials he needed from the jail library at that time to further this law suit. And while there certainly could be circumstances where the jail's denial of access could actually thwart an inmate's legal process, in this suit Gauthier has had a full opportunity at discovery[17] and I can imagine (and Gauthier has left it to my imagining) nothing that Gauthier could have accessed at the jail's library that would have changed the outcome of this suit given the facts and the law at play.

### *Conclusion*

For the reasons stated above, I recommend that the Court deny the motion to dismiss (Docket No. 41) and grant the defendant's motion for summary judgment (Docket No. 45).

### <u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

July 18, 2007                                    /s/ Margaret J. Kravchuk
                                                 U.S. Magistrate Judge

---

[17]      I discuss Gauthier's access to discovery in my recommended decision on Gauthier's motion for summary judgment.